Case number 20-1212, Delaware Division of the Public Advocate et al, Petitioners v. Federal Energy Regulatory Commission. Ms. Roberts for the Petitioners, Ms. Banta for the Respondent, Mr. Flynn for the Intervener. Good morning, counsel. Ms. Roberts, please proceed when you're ready. Good morning. Thank you. May it please the court, my name is Casey Roberts, appearing on behalf of Petitioners. This case is about the Federal Energy Regulatory Commission failing to do its job of protecting consumers from paying excessive rates for electric generating capacity. For years, PJM's capacity auction has forced consumers to pay prices higher than necessary to attract sufficient investment in capacity and also to buy far more capacity than needed to meet the reliability standard. When given a chance in this case to set a course that would alleviate those unnecessary costs, the commission instead approved a demand curve that will result in nearly $100 million in excess costs each year. Petitioners assert three errors in the commission's orders. First, approval of the Greenfield Combustion Turbine as the reference resource. Second, approval of blanket application of the 10% adder in modeling energy revenues of the combustion turbine, which further increased the amount consumers would need to pay for capacity. And third, the commission's decision that it need not consider oversupply in determining whether the filed demand curve would result in reasonable rates. First, FERC erred in approving PJM's decision to use the Greenfield Combustion Turbine as the reference resource. The Greenfield Combustion Turbine is not an accurate representation of the cost of building new capacity in the PJM region. The record shows that cost is estimated to be 25 to 63 percent lower than the cost of building the new Greenfield Combustion Turbine. A demand curve based on a combustion turbine will, in the estimation of PJM's own consultant, perpetuate PJM's chronic excess capacity at a cost to consumers. Commission's approval of PJM's choice of reference technology does not hold up under the three-part test that FERC has applied in two recent IS&E England orders to the same question. Under that test, FERC considers whether the proposed reference resource is likely to be built, whether its costs and revenues can be estimated accurately, and whether a curve based on that resource will procure enough capacity to meet the reliability standard, but not so much that consumers pay unnecessary costs. There's no evidence that a Greenfield Combustion Turbine is likely to be built in PJM. None have been built since 2014, a time period in which roughly 27,000 megawatts of new combined cycle capacity has cleared the auction. FERC points to two Brownfield Combustion Turbines that have been developed since 2014, but the construction of these cheaper facilities at existing sites does not show that a more expensive Greenfield Combustion Turbine is likely to be built in the future. FERC leans heavily on theoretical advantages of combustion turbines, such as lower total cost and quick deployment, but these theoretical benefits are belied by the decisions that developers of new generation have made over and over again in recent years. Likely to be built must mean more than theoretically possible somebody could want to build it. For the demand curve to reasonably approximate the cost of new entry, as FERC has repeatedly held, is critical to this type of inquiry. Can I ask you, Ms. Roberts, it seems like part of the Commission's rationale on this score had to do with the reliability and the reliability of the alternate baseline that you would propose. What's your response to that? Because that seems like certainly a reasonable consideration to take into account. Yeah, so the Commission did sort of repeat PJM's assertion that there were misestimation risks associated with using a combined cycle resource as the reference resource that could result, I think they said, in specific reliability risks. However, what FERC was citing to there was PJM's sort of cherry picking of certain evidence from the record. We provided and pointed to evidence in the record that other curves based on the combined cycle resource would, in fact, meet reliability, even accounting for some risk of misestimating the net cost of new entry. And FERC never addressed that evidence that we pointed to, which undermines the conclusion that it reached. And that's not reasoned decision making. But I thought at least in the Brattle report that Brattle had a number of different models. Are we talking about the combined cycle curves? And that the other curves also had some issues in terms of reliability. They didn't necessarily perform better or meet the target. There was one I thought that maybe did, but most of them had issues as well. Yeah, so Brattle evaluated two curves based on the combustion turbine and four curves based on the combined cycle. And then each of those had sort of other parameters being adjusted. And two of the four combined cycle based curves that it evaluated would meet the reliability standard of no more than one in 10 outages on average, or sorry, one outage in 10 years on average. And both of those curves, that was curves C and D, met that reliability standard, even if their net cost of new entry was underestimated by 20 percent. But the C curve, it performed okay in terms of reliability, but it was still short of curve that PJM preferred and that FERC approved, which was the B curve, the combustion turbine based curve. Yeah, that's correct. Curve C and curve D, which are the two that met the reliability standard, were not, I guess you could say, quite as reliable as the B curve. However, both of them exceeded the reliability standard that FERC has set out in these cases. They both have less than the one outage in 10 years. And so we contend that where curve, you know, these curves exceed the standard. And FERC hasn't justified why consumers should be required to pay costs above what is needed to meet the reliability standard. And isn't it the case that the C curve was also one of the ones that didn't eliminate that rightward shift that everybody seemed to want to get rid of? That's correct. That also, I mean, so we're talking here more like a quarter of a million rather than a hundred million that you that your briefing focuses on, that the difference between the B curve and the C curve is much smaller. Yeah, that's correct. I can't remember exactly what the savings were, but what you suggest sounds about right. So, yeah, the savings increase, you know, excuse me, from the C curve down through the F curve. But I'm sorry, I think I forgot your question relating to that. No, just that it's a narrower perceived benefit in terms of the C curve that the alternative. So, sure. Yeah, I understand the factual coordinates, but it's really an observation more than more than a question. OK, OK, thank you. I would I would just add that, you know, should if the commission were have to decide, were have to decided that the curve based on a combustion turbine was not just unreasonable, then I would expect PJM to have reconsidered and maybe looked at more candidate curves based on a combined cycle to sort of test different options and combinations of parameters. All right. There's no evidence that a greenfield combustion turbine is likely to be built in PJM. Excuse me. Sorry. So NEXFRC failed to respond to evidence that the costs and revenues of the combustion turbine cannot be determined with confidence, the second factor in the ISA New England test. PJM's filing shows that there is inadequate market data to estimate the future revenues of combustion turbines. Petitioners pointed to this evidence both in our protest and on rehearing, but FERC's orders did not address this evidence, which is squarely on point. Instead, FERC focused on why it might be hard to accurately estimate the revenues for a technology that PJM did not propose to use, the combined cycle gas plant. But there again, FERC fails to address evidence contradicting its position. PJM's own consultants specifically disagreed with the conventional wisdom that combined cycle resources are subject to more estimation error. Petitioners pointed FERC to this other evidence in our request for hearing, but FERC failed to respond. This does not constitute reasoned decision making as required by the APA. Well, so the logic though, is that it's harder to estimate the revenues from combined cycle because more of them rely on the real-time energy markets, right? The day ahead and the real-time energy markets, which have yet to occur. Those are going to occur years hence. So it's, it seems intuitively accurate, especially when we're talking about capacity markets, which are insurance against exceptional energy market conditions. So everything's going to be haywire by the time the capacity that's being auctioned today is in use. So maybe the energy markets are going to be more volatile in that context. And any technology or any reference resource that is more reliant on those energy markets, you know, for the net, for the cone, kind of by, by just the logic of the situation is going to be more harder to estimate, harder to pin down. No? Well, so what I would say is that the amount that developers are willing to offer into the capacity auction app reflects their, their anticipation of what energy revenues they will earn. And the brattle said that that was very, very hard to predict for combustion turbines, right? And even though PJM and FERC both state that, oh, well, combined cycles are more reliant on energy revenues. So basically any error is very consequential. In fact, the record shows and PJM pointed to this in its transmittal letter that combined cycles rely on energy market for 61% of their revenues, but combustion turbines rely on it for 27%, which is, you know, only half as much. And so this is where FERC really failed to engage in reasoned decision making when looking at, if, if the consultant is telling you it's very hard to develop accurate energy revenue forecasts for combustion turbines, it's quite easy to do it for combined cycles that it doesn't follow that will combine cycles. Therefore you cannot estimate their, their net cone with accuracy because the difference between the extent to which they rely on those energy revenues is really not quite as stark as PJM presented. The commission did not address the third and most important factor in the IS in New England test, whether PJM's choice of reference technology would result in unnecessary costs for consumers. Failure to examine a central issue presented, especially one that ties so closely to the commission's core duty to ensure just and reasonable rates renders its decision arbitrary and capricious. In its brief before this court, FERC has no answer for this oversight. The record shows that selecting a combustion turbine as the reference resource would lead to higher prices and more capacity than needed to ensure reliability compared to another curve based on the combined cycle reference resource, which we were discussing a minute ago. Petitioners twice pointed FERC to this evidence, but the commission does not respond to either the evidence or petitioner's argument. So I'm going to go ahead and if there are no further questions at this time, save the remainder of my time for rebuttal. Let me just ask you, you opened talking about that as a sort of generally applicable test. I'm not aware of it applying that particular analysis other than to ISO New England. Yeah, FERC has not expressly applied that test to PJM. The test was developed first in a 2014 order and in ISO New England and then reaffirmed in a 2017 order. However, the question that's being evaluated by FERC in those ISO New England cases is identical to what's being evaluated in these PJM cases. And like cases should be treated similarly without an adequate explanation for differentiating among them. And so we see no reason why the ISO New England test and those three criteria should not apply to the exact same question when evaluated in the PJM context. You also emphasized repeatedly that PJM used a greenfield combined turbine facility rather than a brownfield one to calculate the cost. But the site isn't really part of the definition. The site affects the net cone, but not the reference resource. And that seems like that would require a distinct challenge. You've challenged the choice of reference resource. So I just wonder whether the site which affects the net cone is actually in this petition? Is that properly before us? Yeah, I understand. So the reason that we focused on the fact that FERC approved a greenfield combustion turbine is that the cost of that combustion turbine are more than that those at a brownfield site, right? So there's a cost of gas and electric interconnection, there's cost of buying land, right? And those additional costs take it even further away from what we see is the actual cost of new entry in the region, which over the past, you know, I guess five or so years has been 50 to 80% lower than what PJM's administrative net cone had been. And so that takes you even further away from the benchmark that FERC itself has set out in these cases that this administrative net cone value is supposed to accurately represent the cost of net entry of new entry in the region. Okay, unless my colleagues have additional questions for you at this time, we'll hear from the commission and interviewer. Thank you, Ms. Roberts. Ms. Banta? Good morning. I'm Carol Banta for the commission. And I'll begin with this last discussion of the New England cases. In particular, looking at the 2014 case, one thing to remember about those cases is that New England, like PJM, has, the commission said, the tariff does not prescribe how they need to select this resource. And so New England came in and said, here are the factors that we considered. And then in the paragraphs that the petitioners have cited, the commission said, yes, your analysis makes sense to us. Now, to be clear, New England came in under section 205 with its own proposal to which the commission has what this court has called a passive and reactive role. So in PJM, which also has no prescription in its tariff for how to make this decision, PJM came in with its own discussion of, here's what we propose, here are our reasons for it. So the commission said, sure, we'll look at the New England factors because they are similar considerations and they are accounted for in this case. But as far as the question of whether that's some kind of binding precedent, there's nothing in the New England cases where the commission purports to set forth a test that it will apply broadly to every system operator. And indeed, it was echoing New England's own section 205 filing, which the New England operator was within its statutory rights to make. And the commission was considering that proposal. In this case, the commission is considering PJM's PJM adequately supported its case. Now I want to point to where the commission started its analysis in the very beginning of its substantive discussion in the curve order, which begins at paragraph 16. I begin with cost to consumers because that's what the commission in fact did. The commission started its analysis in paragraph 16 and it echoes it again in paragraph 20, which is the first argument that it considers in this case with the focus on cost to consumers and the language in paragraph 16 on JA 298 is in the second sentence. We find PJM's proposed changes result in a curve that meets PJM's reliability needs at a reasonable total cost to load. Load means end users. It means consumers. And I'd point out that reliability needs are not merely a concern of cost to suppliers. Reliability is a consumer interest as well. And one of the commission's primary statutory responsibilities under the Federal Procedure, sorry, the Federal Power Act, in addition, of course, to just and reasonable costs. And what this court has held many times, including in particular in advanced energy, is that there is a balance that sometimes in advanced energy providing reliability under PJM's 205 proposal in that case was going to cost more. And it was a balance of reliability versus perhaps costing more. Is that adjustment reasonable cost? And this court said in advanced energy that the commission in approving PJM's looking at paragraph 16 that the commission starts by saying we find this reasonably balances reliability and cost. Then we look at paragraph 17 where it's summarizing the beginning of PJM's case for its proposal. There's no dispute in this case that PJM's proposed changes lowered the prices of capacity. It lowered the cost. It not only did the shift to the left or undid, I should say it undid an escalation of prices that had been put in place the previous, I believe, 2014. It undid that 1% shift to the right by shifting to the left. That alone brings the curve down. Also, the changes it made, all but one of which, or most, I should say, all but two of which in this case are not contested on appeal, brought that straight line. If you look at the commission's brief at page 13 has the old, the previous curve and the revised curve, it brought that flat line down before the curve even begins its descent at the target margin. That's things like using the H-class turbine instead of F-class turbines. That was hotly contested below. That's not before the court on appeal, but that made a big difference in cost. The other changes to labor costs, cost of capital, various things, all these other changes, there's no dispute that they brought the cost down. Petitioner's argument here is that the cost should be even lower and that PJM is being too conservative about reliability. That's the balance that was in front of the commission that's also on the 205 proposal from PJM and it's also before this court. Then in paragraphs 18 and 19, the commission lays out the public interest entity's argument that the existing curve has been producing over supply. In paragraph 20, it again echoes the language about reasonable cost to load because it says PJM's analysis in its 205 filing is sufficient to meet the requirements of its tariff, which is designed to ensure that the proposed VRR curve meets PJM's reliability needs at a reasonable cost to load. What's important about paragraph 20, when it says the requirements of the tariff are designed to ensure this, we're talking about a larger capacity market mechanism, which is not presented in this case, either to the commission or to the court. The capacity market mechanism is previously approved, most recently in advanced energy. This is just the inputs to one part of it and the commission says that PJM has supported the inputs to this one aspect of the market mechanism. If the asserted problem here is that the market mechanism is resulting in a chronic oversupply, the answer to that is to bring a challenge under 206 to the larger market mechanism that's previously approved that's not an issue in this case. What was before the commission in this case is did PJM adequately support with evidence and its own explanation the changes that it wanted to make to the inputs and its reasons for making them and why those are reasonable. It didn't have to exclude every other possible method, although PJM did go ahead and explain why it wasn't changing to the combined cycle and the commission considered PJM's points in that regard. Ms. Banta, can you talk about the in the record, I think the Brattle report said it was mixed and inconclusive, but do you know how often in practice the combustion turbine offers into the energy market actually use the 10% permission, the 10% adder? Because it just struck me that just because it's authorized wouldn't necessarily, just as a sort of a logical matter, wouldn't necessarily support including it as if every generator used it. Maybe 20% of them use it, in which case maybe it should be a weighted portion of the 10%. It was curious to me that I didn't see any information about something that I gather is optional with the generator, how frequently it's actually used as to sort of, because I gather the whole inquiry here is accuracy when we're talking about trying to calculate the net cone and do that in terms of subtracting revenues. I think the only data we have in the record is Brattle saying we just don't know. Some companies use it and some don't. Mixed reactions on JA146 was exactly what Brattle said. And so in trying to determine the price of a hypothetical resource, the reference resource is a hypothetical resource with the cost that we know. I think what the commission said is given that, I think as the commission says, the offset calculated or estimated for the energy and ancillary services offset reflects all eligible offer cost components. And so the commission just made the judgment that because the 10% is provided in the tariff and was previously in a different case not at issue here determined to be just and reasonable, we don't see a reason to exclude a component that the tariff permits. It seems perverse though. I mean, just because it's permitted doesn't mean it's used. And if the inquiry or if the project, once we're looking at trying to accurately assess Cohen is accuracy, it seems like it's an unnecessary distortion. I mean, unless that information is just not obtainable, what I would want to know is what is the experience of combustion turbines in the energy market? How frequently do they take advantage of the allowable 10% and how I'm not going to take advantage of the allowable 10% because that's just going to put me to the back of the line. I'm not going to be able to sell the energy I have. So is that information that's not available to the commission for some reason wouldn't be accurately predictive? Like, why isn't that information obtainable? I thought Brattle in fact gave a nod to like, maybe you should get that information. Right. And I think Mr. Flynn might be able to answer some of that. I know PJM argued in its brief that it would be difficult to model. One thing I would point out, the hypothetical reference resource is chosen for the entire region. The curve is done a little differently and the markets are run differently in some of the sub regions. And I do believe that there are some parts of the PJM region where for instance, access to gas supplies is different than other parts. So I'm not sure whether that plays into the ability to develop a uniform number. What we do know from this record is that combustion turbines, the reason that that goes into why they're particularly responsive to capacity market revenues, they don't make most of their money from the energy market, unlike combined cycle. Combined cycle costs a lot more to build the fixed costs and then makes up to 60% from the energy market revenues. The combustion, and I just wanted to give a couple of JA sites without belaboring the numbers, but J107, 108 have the costs that Brattle came up with that show you the 300 million for the combustion turbine versus the billion for the combined cycle. The combustion turbines, they're cheaper to build and they're faster to build, which is why they're more responsive to market signals, but they don't run as often. They're peaking. So I think they tend to run- But their revenue numbers were, I mean, again, it's only one component, but their revenue numbers were substantially affected by the 10% assumption, taken down by like a third, I think, or- Which of 27% would be about 9% of their total costs. So I don't have a number on, since we do know that they don't run as often and they do tend to run when the system is peaking, I think that may play into what kind of costs they can bid at. I don't have much more on that. The commission really made the policy judgment based on if we've allowed it in the tariff, we don't see a basis to exclude it here just because some, I mean, some combustion turbines that have great access to gas supplies may have a competitive advantage in the real market, but for the hypothetical resource, the commission just chose not to make the assumptions about that. Okay, thank you. Let me make sure my colleagues don't have additional questions for you, Ms. Banta. Okay, thank you, Ms. Banta. We'll hear from Mr. Flynn for the intervenors. Good afternoon, Paul Flynn, FGM Interconnection. Starting with the 10% contingency, when we refer you to J33 and 34, which is where you find the tariff definition that was modified to insert the 10% rule. And what you will find is something called peak hour dispatch. And peak hour dispatch is an extensive set of rules to set administratively when this hypothetical generic combustion turbine plant will run and as you can see, there are quite a lot of standardized and simplifying assumptions to capture that hypothetical circumstance for this unit. We're not talking about what anyone actually does in the energy market. We're talking about setting some reasonable standard simplifying assumptions for when that hypothetical resource will run, like these four hour blocks and three hour blocks and how often during the day. It's pretty extensive and there are a lot of assumptions in it. My take is that FERC basically thought that, look, what mattered was, and this is what they said in their order, that what mattered was that other components of that, this is at paragraph 31 of the rehearing order, JA401, other components of energy offers are already included in the energy offset estimate. And we agree that it is appropriate to include the 10% adder as well, since it too is a permissible component of energy offers. It's called an adder, but it's really to deal with the uncertainty that exists about in particular fuel costs when you're making an offer in advance. But I haven't heard you respond to the main question I have, which is, I mean, let's say it were known that combustion turbines bids into the energy markets only less than 5% of the time use the adder. Would that not be material along with the generic notion that it's permissible for them to use it 100% of the time? Well, that is a hypothetical question. Evidence to that extent was not presented. And I mean, you could say zero percent, you could say 100%, or you could say, let's get a lot more complicated about how this works in the context of this one subset of this assumption. Right, or let's just ask generally, the combustion turbine owners, and if it turns out that it's something in between, wouldn't it be more accurate and accuracy is what we're looking for here, wouldn't it be more accurate to say, let's put 50%, let's not put the whole 10%, let's put a weighted 10%. And we know that the economic logic is going to deter combustion turbines from actually making use of the up to 10% adder, because it will make their already expensive energy more expensive. So why shouldn't it at least be, we're not, you know, standard of review, double deference, we read your briefs. But nonetheless, it seems like there's a logical potentially dropping of the ball here. And I'm just looking at what your best answer is. Well, first rationale was stated in the order. I guess the question is, how far on every one of these assumptions does FERC have to go to establish that what is overall, the demand curve that the end of the day, it's the demand curve that is used to balance cost and reliability is just unreasonable. And FERC did that in spades, because we provided them ample evidence on that. And if you're willing, I'd like to turn to that next, if you'll give me the time to do that. Um, it just your time, your time to spare. So I just want to make sure that you're addressing the particular question before you about the 10%. And I have one follow up question, which is, do we know on the 10%, if it's made use of, let's say half the time, just as a just as a ballpark, do we know how much of an effect that would actually have on the demand curve? I don't know that we have that day. And it'd be much I don't know how that would, it is not, it is not counterintuitive for a seller to say, I'm legitimately concerned about whether or not my fuel cost might be uncertain. And so I'm going to add that contingency in there. So that is not economically irrational, they may do that. But we don't have evidence in record of the extent to which that is done. Because again, FERC looked at it in terms of a permissible energy offer a maximum energy that they would permit would include these factors, which is the type of analysis they they do in other cases in the capacity market in terms of what's acceptable. Do we know Mr. Flynn, if there was 10% or zero, if the if the 10% were disallowed, we do know how much difference that makes in the demand curve, do we not? It's not the 100 million that Ms. Roberts has been certainly has to do with the choice of price based on including the 10% in the net cost. I'm not sure your honor, you would, again, it's a modeling effort specific to the peak hour dispatch, because you're saying under this entire set of assumptions, if you also assume that they do not have this extra bit in their offer, what happens every hour of the year in terms of how it's not a simple calculation that you can just do the math and say, oh, it's this. They're only in the market a very few hours. Presumably past performance information. Maybe ask Ms. Roberts when she's back before us. But yeah, it would be helpful. I mean, if the chief is not averse to have you talk about the first issue as well. I would love to. And again- Why don't you just take a minute to do that? Sure. Could I draw your attention to, it is Joint Appendix 189, which is battles to port on the demand curve. Table 11. This is what you were referring to earlier in the argument, Judge Collard. Brattle does Monte Carlo simulations that look at a thousand different slightly varying scenarios and come up with an average and a projection for reliability and for cost. And they do that in this case for six different curves. Two of them were existing curves. So really there's one combustion turbine that was new and three combined cycles that were new. And if you made it to that table, if I could draw your attention to the fourth column in from the left, which is where the costs are. I'm sorry, tell me again what page you're on. I don't think I'm on the right- 189. 189. So when you get to that table and you look at the cost column, which is the fourth set of numbers in, you'll see a very tight range of costs. It's on the order of 7.9 billion to 8 billion, more or less, captures all of the different curves that were considered. And specifically, the curve that FERC approved is B as in boy at 8.06 million. And the curve that petitioners have advocated is D as in David, 7.97 billion. So for cost, we're talking a difference of about 1% in these Monte Carlo simulations of future costs and future reliability. So we're not saying, oh my gosh, they're going to pay an extra $90 million a year coming out of someone's pocket. This is a comparison of modeling scenarios. And there's only a 1% difference between the two. And then you look over to the column, which is second from the right. And that shows the number of percentages for the different curves, including how frequently each of those curves is expected to produce a result below the reliability requirement. And you see for B, it's 0%. And for D, it's 5%. So there's a bit of a difference there. There's a bit of a difference, which is adverse from a reliability perspective. If you look at the column that is called average LOL, it's like in the middle. And then stress LOE. Stress LOE says, it's like stress testing anything. What if one of our assumptions is off by a bit? You'll see that of the three combined cycles, which are the last three numbers, two of them are above a tenth of a percent, which means they violate on an average basis, the expectation that you'll only have one loss of load every 10 years. So as a group, the CECs clearly do worse than the combustion turbines. So what does FERC have to say about all this? FERC says, and they, when they briefly note, and they're opening to the discussion of the VRR curve, which is where this appears, all this stuff about the cost of a combustion turbine versus the reliability of a combustion turbine and a combined cycle, all appears in FERC's discussion of the VRR curve, not of the reference resources. But that's where the numbers of $100 million that petitioners have cited, that's where that comes from. So FERC, in that brief introduction at paragraph 17 of the initial order, notes QGEM's statement that all of the annual cost projections were clustered fairly close together, with the total customer cost difference over all percent. That's one of the few facts they cite in that opening. And then they say in paragraph 16, QGEM's proposed changes result in a curve that means QGEM's reliability needs any reasonable total cost of load, which is the numbers we were just looking at. And then similarly, in paragraph 20 of J301, QGEM's analysis, excuse me, was sufficient to meet the requirements of its tariff, which is designed to ensure the proposed demand curve meets QGEM's reliability needs at a reasonable total cost to load. And we know they were talking about the Monte Carlo simulation model when they say that, because in the very next breath, they say that the public interest entities, which is the petitioner group. Let me ask you, Mr. Flint, because I know we're over time, and just going back to the 10%. So PGM didn't actually investigate the issue before adopting the adder, right? I mean, Brattle had said, it's sort of difficult to study, but you know, it might be a And that PGM chose not to do that investigation, right? It was more of a normative call on the basis of this is an element of what people can offer in the energy market, and you shouldn't just exclude it. And so we included it. Right. And there was no reasoning in so doing that making a more fine-tuned factual judgment was going to be too difficult and too much of a going down a rabbit hole. It wasn't like, well, it'd be great if we had that information. But we, on balance, decided it's going to be, it's not gonna be worth the candle to do that further investigation. It just was like, this is permissible, and that's enough. Yeah, I don't know that there was a sense that they said that it would be very easy to make that determination. I don't think that they didn't, they said that they said that it's a little tricky, but maybe, maybe it's worth further study. And that was not taken up by That's what Brattle said. Yes, right. But I don't know that PJM said, no, it's not worth it. Exactly. Didn't say that, just said it's, it's authorized and therefore we're going with it. And it's better to include it than not. And so that was proposed to be included and for conceptually on that basis as part of a lawful offer in the energy market, which is a rational sort of approach. Okay. All right. Thank you. Let me make sure my colleagues don't have additional questions for you, Mr. Flynn, this time. Thank you, Mr. Roberts. We'll give you your three minutes for your rebuttal, please. I appreciate it. Thank you, Your Honor. So I first want to pick up on this, the 10% adder issue briefly. You're absolutely right, Judge Pillard, that we don't know how often the 10% adder is used and FERC has a tool at its disposal to get more information in these kinds of situations. It can issue a deficiency letter to PJM to ask them to submit additional information. FERC did that on a different issue in the case, could have done it on 10%, but I think just decided that that level of accuracy wasn't, wasn't important, didn't use the tool at its disposal. And this whole 10% adder issue, which as you've noted, can affect, this assumption, this single assumption can affect the energy revenues that are earned by the reference resource by one third, just shows why it's hard to estimate the cost and revenues of a combustion turbine. And one reason why it doesn't pass muster under that three-part test. And joint appendix 141 bridal discusses these, these uncertainties about gas procurement costs being one reason why it's so hard to determine the costs and revenues for a combustion turbine resource. Next, I'd like to just touch on the evidence that Mr. Flynn was showing the frequency below the reliability requirement. I want to stress that FERC has said that that reliability requirement must be met on average, not in every single year. So the column he was pointing to about this is the percentage likelihood below the reliability requirement is on an every year basis, which is not the standard that FERC has set. And this goes to something that Ms. Banta was saying. Of course, FERC can allow rates to increase to ensure reliability, but it needs to explain why it's doing so. And it needs to be specific. So if FERC wants to depart from its prior determination that the reliability standard is one in 10 on average, I suppose that it could do so, but it would need to do so consciously and explain why the additional costs that are being imposed on consumers are now necessary in its view, rather than adhering to the previous formulation of the reliability standard. And that is established. And finally, I want to note that the language quoted by both Ms. Banta and Mr. Flynn about FERC's consideration of cost is really lip service to this requirement that they look at the cost. Simply saying the word cost, or this is at a reasonable cost, does not meet the requirement for reasoned decision making, where very specific arguments have been made in a incremental reliability benefit that consumers would receive. So FERC just didn't ever talk about what's the incremental reliability benefit of sticking with the CT? What's the incremental cost associated with that? And make an express decision that that cost was worth that cost. So just generally referring to this is at a reasonable cost doesn't pass muster. So that's all I have. We respectfully ask the court to remand the FERC orders in question based on the orders that we've noted in our briefs. Thank you. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Henderson, Pillard